## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**JOHN P.,**

      **Plaintiff,**

                                 **Case No. 2:20-cv-8455**

    **v.**                           **Magistrate Judge Norah McCann King**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff John P. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying those applications.[1] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

This case has a lengthy procedural history that includes a total of three administrative decisions authored by two different Administrative Law Judges and two orders of remand from

---

[1] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

this Court. Specifically, on March 30, 2009, Plaintiff filed his applications for disability insurance benefits and supplemental security income, alleging that he has been disabled since January 1, 2007. R. 90−93, 152−61. The applications were denied initially and upon reconsideration. R. 94−98, 102−07. Plaintiff sought a *de novo* hearing before an administrative law judge. R. 108−09. Administrative Law Judge Donna A. Krappa ("ALJ Krappa") held the first administrative hearing on March 2, 2011, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R. 27−89. In a decision dated August 24, 2011, ALJ Krappa concluded that Plaintiff was not disabled within the meaning of the Social Security Act from January 1, 2007, Plaintiff's alleged disability onset date, through the date of that decision ("ALJ Krappa's first decision"). R. 12−22. The Appeals Council declined review of that decision on August 8, 2013. R. 1−4. Plaintiff filed an appeal and, on November 17, 2014, United States District Judge Susan D. Wigenton reversed that decision and directed that, on remand, the Commissioner further evaluate the opinion of Plaintiff's treating physician, Joseph Acquaviva, M.D., as well as Plaintiff's mental and physical impairments. R. 579−92.

Following remand, the Appeals Council remanded the case to ALJ Krappa for further proceedings consistent with Judge Wigenton's decision. R. 593−96. On September 30, 2015, ALJ Krappa conducted a second hearing, at which Plaintiff, who was again represented by counsel, again testified. R. 537−70. In a decision dated December 29, 2015, ALJ Krappa again concluded that Plaintiff was not disabled within the meaning of the Social Security Act from January 1, 2007, Plaintiff's alleged disability onset date, through the date of that decision ("ALJ Krappa's second decision"). R. 518−36. On January 30, 2017, the Appeals Council declined to review that decision. R. 510−15. On November 28, 2018, United States District Judge Jose L. Linares granted the parties' request to remand the action. R. 969−70.

2

On that second remand, the Appeals Council entered the following order:

The Appeals Council hereby vacates the final decision of the Commissioner of Social Security and remands this case to an Administrative Law Judge for resolution of the following issues:

- The hearing decision does not contain a discussion of the recently submitted evidence in Exhibits 20F through 27F. This evidence contains over two hundred pages of treatment records relating to the claimant's physical and mental impairments.

  Regarding the physical impairments, the evidence shows claimant has been diagnosed with chronic pancreatitis (Ex. 20F, p. l). It contains a lumbar CT scan showing diffuse disc bulge at L4-5, and shows the claimant has been diagnosed with lumbar spondylosis and received facet injections (Ex. 23, p.3, and 24F, p. l). There is a cervical MRI showing a left-sided herniated disc at CS-6 effacing the spinal cord and impressing the existing nerve root (Ex. 24F, p.5).

  Regarding the claimant's mental impairments, the evidence shows the claimant began treating with a new mental health provider, Bergan Regional Medical Center (Ex. 26F). It shows an exacerbation of his mental health symptoms and prescription drug abuse, including ongoing drug use. His diagnosis was updated to include substance abuse because "his narrative is most suggestive of a chemically induced mood disorder" (Ex. 26F, p.150).

  Consideration of this evidence is necessary.

- The hearing decision does not contain an evaluation of the treating source opinion from Dr. Acquaviva, dated September 29, 2015 (Ex. 27F, p.6). This opinion describes the claimant's abilities in several areas of unskilled work as "Inadequate" or "Poor/None" (Ex. 27F, p.9). Evaluation of this opinion is necessary.

  Upon remand the Administrative Law Judge will:

- Consider the additional evidence submitted to the record, and develop the record with requests for current records as necessary.

- Obtain additional evidence concerning the claimant's physical and mental impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512 and 416.912). The additional evidence is to include a physical and a mental consultative examination, and medical source opinions about what the claimant can still do despite the impairments.

- Further, if necessary, obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from the claimant's impairment

3

(20 CFR 404.1513a(b)(2) and 416.913a(b)(2)).

- Give further consideration to the treating and nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and 416.927 and nonexamining source opinions pursuant to the provisions of 20 CFR 404.1527 and 416.927, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and nontreating source provide additional evidence and/or further clarification of the opinion (20 CFR 404.1520b and 416.920b).

- Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-8p).

- If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-12, 83-14 and 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

- Conduct the further proceedings required to determine whether drug addiction and alcoholism are contributing factors material to any finding of disability.

R. 973–75. Furthermore, the Appeals Council directed that the matter be assigned to a different

ALJ who was to "offer the claimant the opportunity for a hearing, take any further action needed

to complete the administrative record and issue a new decision." R. 975.

On January 14, 2020, ALJ Ricardy Damille ("ALJ Damille") held yet another

administrative hearing, at which Plaintiff, who was again represented by counsel, testified, as did

4

a vocational expert. R. 941−68. In a decision dated April 20, 2020, ALJ Damille concluded that Plaintiff was not disabled within the meaning of the Social Security Act from March 16, 2009, Plaintiff's amended alleged disability onset date,[2] through the date of that decision ("ALJ Damille's decision"). R. 914−40. That decision became the final decision of the Commissioner of Social Security. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On April 1, 2021, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 10.[3] On April 6, 2021, the case was reassigned to the undersigned. ECF No. 11. The matter is ripe for disposition.

## II.   LEGAL STANDARD

### A.   Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

---

[2] On January 14, 2020, Plaintiff amended his alleged disability onset date. R. 1112.

[3] The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists

only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to

scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.

> **B.      Sequential Evaluation Process**

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at §§ 404.1509, 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be

disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    ALJ DAMILLE'S DECISION AND APPELLATE ISSUES

Plaintiff was 40 years old on his amended alleged disability date of March 16, 2009. R. 931. At step one, ALJ Damille found that Plaintiff had not engaged in substantial gainful activity between that date and the date of the decision. R. 920.

At step two, ALJ Damille found that Plaintiff suffered from the following severe impairments: lumbar and cervical disc herniation; osteoarthritis of the knees; chronic pancreatitis; obesity; depressive disorder; bipolar disorder; panic disorder; and drug abuse in remission *Id*. The ALJ also found that Plaintiff's alleged intermittent headaches were not severe. *Id*.

At step three, ALJ Damille found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 921–23.

At step four, ALJ Damille found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 923–31. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a stock broker, loan officer, and auto parts clerk. R. 930–31.

At step five, ALJ Damille found that a significant number of jobs–*i.e*., approximately 20,000 jobs as a sealing machine operator; approximately 30,000 jobs as a microfilm mounter; approximately 30,000 jobs as a small part assembler–existed in the national economy and could be performed by an individual with Plaintiff's vocational profile and RFC. R. 931–32. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act

from March 16, 2009, his amended alleged disability onset date, through the date of the decision. R. 932–33.

Plaintiff disagrees with ALJ Damille's findings at step four and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 19; *Plaintiff's Reply Brief*, ECF No. 21. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because ALJ Damille's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1,* ECF No. 20.

## IV.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    Robert Starace, Ph.D.

On June 11, 2009, Robert Starace, Ph.D., completed an eleven-page check-the-box and fill-in-the blank form entitled "Psychiatric Review Technique" on behalf of the state agency. R. 240–50. The assessment addressed the period beginning January 1, 2007 (Plaintiff's original alleged disability onset date) and Listings 12.04 (affective disorders) and 12.08 (personality disorders), R. 240, but Dr. Starace concluded that Plaintiff's impairments did not satisfy the criteria for those listings. R. 243, 245. Specifically, in addressing the criteria for paragraph B of those listings, Dr. Starace opined that Plaintiff had "mild" limitations in his activities of daily living and in maintaining concentration, persistence, or pace; "moderate" limitations in maintaining social functioning; and no episodes of decompensation of extended duration. R. 248. Dr. Starace further opined that Plaintiff did not meet the criteria of paragraph C of the listings. R. 249. Dr. Starace explained his conclusions as follows:

11

This 40 yo male presents with physical complaints and also alleges depression and bipolar disorder. FO interviewer (4/6/09) found clt to present as angry. It is noted that clt states that he receives psych outpt tx (Bergen Regional MC: since 2/25/09). *However, attempts were made to secure documentation to no avail.*

*Given the paucity of MS documentation in file a psych CE (6/6/09) was obtained for clarification*. Clt reports to CE that he was mandated to an outpt drug tx program. He states that he is rx'd Lamictal, Seroquel and Xanax. He reports mood swings. CEMSE notes some irritability. However, clt is described as cooperative with appropriate affect and no SI [suicidal ideation]. The remainder of the objective findings of the CEMSE are largely WNLs [within normal limits] with no notably marked limitations on any domain. ADLs are adequate as per description.

In summary, despite some mood difficulties: the overall MER does not substantiate the presence of sustained marked limitations. Overall MER supports the conclusion that clt can understand, remember and execute simple routine instructions/tasks; can sustain concentration, pace persistence; can socially interact adequately; can adapt to changes.

R. 250 (emphasis added).

On June 11, 2009, Dr. Starace also completed a three-page check-the-box and fill-in-the blank form entitled "Mental Residual Functional Capacity Assessment." R. 252−54. According to Dr. Starace, Plaintiff was not significantly limited in his ability to understand and remember, including the abilities to remember locations and work-like procedures, to understand and remember very short and simple instructions, and to understand and remember detailed instructions. R. 252. Dr. Starace also opined that Plaintiff was not significantly limited in his abilities to sustain concentration and persistence, including his abilities to carry out very short and simple instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods. R. 252−53. As to Plaintiff's social interaction abilities, Dr. Starace opined that Plaintiff was moderately limited in his abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavior extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; he was not significantly limited in his ability to ask simple questions or request assistance. R. 253. Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, but was not significantly limited in his abilities to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. *Id.*

### B.    State agency reviewing medical consultants

On August 14, 2009, Benjamin Cortijo, M.D., conducted an initial review of Plaintiff's medical record on behalf of the state agency. R. 266−71. According to Dr. Cortijo, Plaintiff could occasionally (occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)) lift and/or carry up to 20 pounds and frequently (occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)) lift and/or carry up to 10 pounds. R. 266−67. Plaintiff could stand and/or walk (with normal breaks) and could sit for a total of about 6 hours in an 8-hour workday and sit (with normal breaks). R. 267. Plaintiff was unlimited in his ability to push and/or pull (including operation of hand/foot controls), other than as indicated for lifting and/or carrying. *Id*. As for postural limitations, Dr. Cortijo opined that Plaintiff could occasionally climb ramps, stairs, ladders, rope, and scaffolds; balance; stoop; kneel; crouch; and crawl. R. 267−68. According to Dr. Cortijo, Plaintiff had no manipulative, visual,

13

communicative, or environmental limitations. R. 268−69. Dr. Cortijo considered Plaintiff's

alleged symptoms, but discounted them as follows:

> Claimant reports knee and pain which worsens with standing more than 1 hr. This
> is not credible as claimant does have pain but physical exam findings and
> observations made by multiple medical which include treating sources, CE in
> medicine and mental status eval and nonmedical sources, including field office
> reveal able to sustain normal gait pattern. Based on entire non-medical and medical
> evidence limit stand/walk 6 hr/8hr.

R. 270. Dr. Cortijo explained his assessment as follows:

> Claimant reports low back and knee pain.

> X-rays of lumbar spine dated 07-22-09 are within normal limts.

> X-rays of bilateral kness reveal mild osteoarthritic changes.

> Clinical progress note dated 03-16-09 from Dr Jacobs at Bergen Regional Medical
> Center reported history of nexk pain with dx of disc hernaiations as per climant but
> this was about 10 years ago. Came in for this physical exam due to one week history
> of mid and low back pain, which was initially treated in emergency room and has
> shown improvement Dr. Jacobs' in history writes there has been no back pain for
> since 10 years ago until this particular acute onset one week ago. Even with low
> back pain and knee pain claimant noted during physical exam of 03-16-09 at this
> time to have normal gait with independent transfers on exam table.

> Physical exam at CE reveals decreased range of motion at cervical spine, painful
> patellar crepitus on left and crepitus at bilateral knees, the SLR of 85 amounts to a
> negative SLR test. Gait is normal, able to heel and toe walk, able to squat. He is 6
> ft 2in, 220 lbs (BMI 28)  Motor strengh is normal in presence of pain therefore
> would limt lift/cary 20 lbs occ, 10 lbs feq, stand/walk 6 hr/8hr..

> Agree with dat of onset 01-01-07.

R. 271 [sic]. Frederick Cohen, M.D., who reviewed Plaintiff's medical record upon

reconsideration for the state agency on December 3, 2009, affirmed Dr. Cortijo's RFC

determination. R. 340.

### C.     Joseph Acquaviva, M.D.

On November 5, 2009, Joseph Acquaviva, M.D., Plaintiff's treating psychiatrist,

completed a six-page check-the-box and fill-in the blank form entitled, "Psychological / Mental Impairment Functional Capacity Assessment." R. 334−39. Dr. Acquaviva first treated Plaintiff on March 28, 2000. R. 334. On the DSM-IV Axis I, Dr. Acquaviva diagnosed bipolar disorder manifested by the following signs and symptoms: poor memory, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interest, feelings of guilt/worthlessness, difficulty thinking or concentrating, decreased energy, and generalized persistent anxiety. R. 334. "Pt has mood swings, trouble concentrating[.]" R. 335. Dr. Acquaviva did not indicate when the symptoms and conditions had begun. *Id*. The side effects of Plaintiff's medication (Lamictal and Seroquel) consisted of fatigue and lethargy. R. 335. According to Dr. Acquaviva, Plaintiff's impairment had lasted or could be expected to last at least twelve months and his psychiatric condition exacerbated pain or other physical symptoms: "[Plaintiff] has had [illegible] outpatient surgeries & has chronic pain in knees & back[.]" R. 335−36. On average, Plaintiff's impairments or treatment would cause him to be absent from work more than three times per month. R. 336. Dr. Acquaviva described Plaintiff's ability to perform certain activities using the following scale: "Unlimited/Very Good" (no loss of ability to perform the named activity); "Good" (some loss of ability to perform the named activity but still capable of performing it in regular competitive employment); "Fair" (substantial loss of ability to perform the named activity in regular, competitive employment and, at best, could do so only in a sheltered work setting where special considerations and attention is provided); and "Poor/None" (complete loss of ability to perform the named activity in regular, competitive employment and in a sheltered work setting; could do so only to meet basic needs at home). R. 337. Plaintiff had a good ability to ask simple questions or request assistance and a fair ability to do the following: understand and remember very short and simple instructions; carry out very short and simple

15

instructions; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and to be aware of normal hazards and take appropriate precautions. *Id.* Plaintiff had a poor or no ability to remember work-like procedures; maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and deal with normal work stress. *Id.* Plaintiff had fair abilities to interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation. R. 338. Dr. Acquaviva did not respond to the question asking him to indicate the degree of limitation caused by Plaintiff's mental impairments in the following areas: restriction of activities of daily living; difficulties in maintaining social functioning; deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere); and episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). *Id.* When asked whether, to his knowledge, there were any other limitations that affect Plaintiff's ability to work at a regular job on a sustained basis, Dr. Acquaviva answered "No." R. 339. Dr. Acquaviva opined that Plaintiff could manage benefits in his own best interest. *Id.*

On March 7, 2011, Dr. Acquaviva completed a six-page check-the-box and fill-in-the-

16

blank form entitled, "Psychological Impairment Functional Capacity Assessment (Drug and Alcohol Supplement)." R. 494–99. Dr. Acquaviva treated Plaintiff "~ monthly" and had most recently examined Plaintiff on February 2, 2011. R. 494. According to Dr. Acquaviva, Plaintiff's substance abuse condition had been in partial remission since September 2010 but that Plaintiff's drug and/or alcohol abuse was not a "material contributing factor" in Plaintiff's disability because Plaintiff was "Drug free x 2 years, Has mood swings > 10 years regardless of drug use[.]" R. 494–95. On the DSM-IV Axis I, Dr. Acquaviva diagnosed bipolar disorder (296.62) manifested, regardless of substance abuse, by sleep disturbance; mood disturbance; emotional lability; anhedonia or pervasive loss of interests; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; decreased energy; generalized persistent anxiety; and hostility and irritability. R. 495. Dr. Acquaviva reported clinical findings of rapid mood swings, decreased concentration, and irritability and noted that Plaintiff's symptoms and conditions had existed for approximately three years. R. 496. The side effects of Plaintiff's medication (Seroquel, Lamictal, and Alprazolam) were fatigue and drowsiness. *Id*. Plaintiff's impairment had lasted or could be expected to last at least twelve months and his psychiatric condition exacerbated pain or other physical symptoms. *Id*. Again, Dr. Acquaviva opined that, on average, Plaintiff's impairments or treatment would cause him to be absent from work more than three times per month. R. 497. Dr. Acquaviva described Plaintiff's ability to perform certain activities using the following scale: "Unlimited/Very Good" (no loss of ability to perform the named activity); "Fair" (some loss of ability to perform the named activity but still capable of performing it in regular competitive employment); "Inadequate" (substantial loss of ability to perform the named activity in regular, competitive employment and, at best, could do so only in a sheltered work setting where special considerations and attention is provided); and

17

"Poor/None" (complete loss of ability to perform the named activity in regular, competitive employment and in a sheltered work setting; could do so only to meet basic needs at home). *Id*. Plaintiff had a fair ability to perform unskilled work that required understanding and remembering very short and simple instructions; carrying out very short and simple instructions; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; and being aware of normal hazards and taking appropriate precautions. R. 498. Plaintiff had a good ability to ask simple questions or request assistance and a fair ability to remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and to be aware of normal hazards and take appropriate precautions. *Id*. Plaintiff had inadequate abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms; to accept instructions and respond appropriately to criticism from supervisors; and to deal with normal work stress. *Id*. Plaintiff had a poor or no ability to maintain attention for two-hour segments and maintain regular attendance and to be punctual within customary, usually strict tolerances. *Id*.[4] As to Plaintiff's mental

---

[4] Dr. Acquaviva's explanation for his assessment that Plaintiff had a poor or no ability in these two areas is illegible. *See id*.

abilities and aptitudes needed to perform particular types of jobs, Dr. Acquaviva opined that

Plaintiff had a fair ability to interact appropriately with the general public; maintain socially

appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar

places; and use public transportation. *Id*. Dr. Acquaviva left blank the area on the form asking

him to explain the basis of this assessment and to identify the medical/clinical findings that

supported this assessment. *Id*. Dr. Acquaviva also opined that Plaintiff had a "[s]light"

(undefined in the form) restriction of activities of daily living and "[s]light" difficulties in

maintaining social functioning, "[f]requent" (undefined in the form) deficiencies of

concentration, persistence or pace resulting in a failure to complete tasks in a timely manner (in

work settings or elsewhere) and "[r]epeated" (defined as three or more) episodes of deterioration

or decompensation in work or work-like settings which cause Plaintiff to withdraw from that

situation or to experience exacerbation of signs and symptoms (which may include deterioration

of adaptive behaviors). R. 499.  Dr. Acquaviva indicated that, to his knowledge, there were no

other limitations that would affect Plaintiff's ability to work at a regular job on a sustained basis.

*Id*. He also noted that Plaintiff could manage benefits in his own best interest. *Id*.

On September 29, 2015, Dr. Acquaviva completed a seven-page check-the-box and fill-

in-the-blank form entitled "Psychological/Mental Impairment Functional Capacity Assessment."

R. 731−37; 907−13. Dr. Acquaviva stated that he first treated Plaintiff on March 22, 1999, and

had most recently examined him that day, with treatment being "[i]ntermittent[ ], [illegible],

current treatment monthly at Bergen Regional[.]" R. 731. On the DSM-IV Axis I and Axis II, Dr.

Acquaviva diagnosed bipolar disorder and panic disorder with generalized anxiety, identified by:

sleep disturbance; mood disturbance; emotional lability; substance dependence ("in past");

feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or

isolation; and generalized persistent anxiety. *Id.* "[C]linical findings" consisted of the following: "Anxious, labile mood; easily [illegible]." R. 732, 908. According to Dr. Acquaviva, Plaintiff's symptoms and conditions had existed since 2005 and had lasted or could be expected to last at least twelve months. *Id.* Plaintiff's prescribed medications were Lamictal, Celexa, Klonopin, Seroquel, Neurontin, Zofran, Oxycodone, and Ventolin. *Id.* (noting further two additional illegible medications and noting an illegible, one-word side effect). Furthermore, Plaintiff's psychiatric condition exacerbated his pain or other physical symptoms, although Dr. Acquaviva did not explain this comment. R. 732–33, 908–09. Dr. Acquaviva opined that Plaintiff's impairments or treatment would cause him to be absent from work more than three times per month because of symptoms of pain, anxiety, and insomnia. *Id.* Dr. Acquaviva described Plaintiff's ability to perform certain activities using the following scale: "Unlimited/Very Good" (no loss of ability to perform the named activity); "Fair" (some loss of ability to perform the named activity but still capable of performing it in regular competitive employment); "Inadequate" (substantial loss of ability to perform the named activity in regular, competitive employment and, at best, could do so only in a sheltered work setting where special considerations and attention is provided); and "Poor/None" (complete loss of ability to perform the named activity in regular, competitive employment and in a sheltered work setting; could do so only to meet basic needs at home). R. 734–35, 910–11. Dr. Acquaviva specifically opined that Plaintiff had a "fair" ability to remember work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; and to be aware of normal hazards and take appropriate precautions. *Id.* Plaintiff had an "inadequate" ability to maintain attention for a two-hour segment; to work in coordination with or proximity to others without being unduly

20

distracted; to make simple work-related decisions; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in a routine work setting. *Id*. Plaintiff had a "poor" or no ability to maintain regular attendance and to be punctual within customary, usually strict tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to deal with normal work stress. *Id*. As to Plaintiff's mental abilities and aptitudes needed to do particular types of jobs, Dr. Acquaviva opined that Plaintiff had a "fair" ability to maintain socially appropriate behavior; to adhere to basic standards of neatness and cleanliness; and to use public transportation. R. 736, 912. Plaintiff had an "inadequate" ability to interact appropriately with the general public and to travel in unfamiliar places because Plaintiff "became agitated easily, low frustration tolerance[.]" *Id*. According to Dr. Acquaviva, Plaintiff had no restriction of his activities of daily living; "[m]oderate" (undefined in form) difficulties in maintaining social functioning; "[f]requent" (undefined in form) deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere); and "[r]epeated" (three or more) episodes of deterioration or decompensation in work or work-like settings which caused him to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). *Id*. Dr. Acquaviva indicated that, to his knowledge, there were no other limitations that would affect Plaintiff's ability to work at a regular job on a sustained basis. R. 737, 913. He also noted that Plaintiff could manage benefits in his own best interest. *Id*.

In a letter also dated September 29, 2015, Dr. Acquaviva wrote:

To Whom It May Concern:

[Plaintiff] has been treated intermittently by me for sixteen years. He suffers from Bipolar Disorder, Panic Disorder, and Generalized Anxiety. In the past, he has had bouts of substance abuse, in an effort to medicate his illness. He is currently clean for over four years. He also has spinal stenosis and four herniated discs. The combination of the illnesses has made it difficult for [Plaintiff] to pursue any kind of regular employment. He also has suffered from insomnia for many years. The combination of chronic pain, mood instability, and anxiety has been present for over ten years.

R. 726.

### D.   Ulfat Shahzadi, M.D.

On January 2, 2020, Ulfat Shahzadi, M.D., Plaintiff's treating psychiatrist, completed a four-page check-the-box and fill-in-the-blank medical source statement. R. 1990−93. Dr. Shahzadi had first treated Plaintiff on July 1, 2019. R. 1990. On the DSM-IV, Dr. Shahzadi diagnosed unspecified bipolar disorder and unspecified personality disorders, noting that Plaintiff was "[p]artially compliant with treatment recommendations. Would require intensive therapy for optimal response. Not agreeable." *Id*. Prescribed medications were Lamictal, Neurontin, Celexa, Seroquel, and Klonopin, and Dr. Shahzadi noted no side effects. *Id*. The clinical findings that demonstrated the severity of Plaintiff's mental impairment and symptoms consisted of "Poor insight and Judgement." *Id*. Plaintiff's prognosis was poor to fair. *Id*. Plaintiff's intellectual functioning was not limited. R. 1991. Dr. Shahzadi used the following scale to rate the degree of Plaintiff's expected limitations in a work setting:

**Moderate** means the ability to function independently, appropriately, effectively and on a sustained basis is fair;

**Marked** means the ability to function independently, appropriately, effectively and on a sustained basis is seriously limited;

**Extreme** means **not able** to independently, appropriately, effectively and on a sustained basis, but it does not mean a total loss of the ability to function.

22

*Id.* According to Dr. Shahzadi, Plaintiff had no to mild limitations in understanding and applying information and moderate limitations in remembering information, concentrating, and maintaining pace. *Id.* Plaintiff had extreme limitations in interacting with others, persisting, adapting in the workplace, and managing oneself in the workplace. *Id.* Dr. Shahzadi identified the following signs and symptoms: depressed mood; difficulty concentrating or thinking; excessive emotionality and attention seeking; recurrent, impulsive, aggressive behavioral outbursts; hyperactive and impulsive behavior (*e.g.*, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor"); irritability; disregard for and violation of the rights of others; distrust and suspiciousness of others; instability of interpersonal relationships; inflated self-esteem; and distractibility. R. 1992. According to Dr. Shahzadi, (1) Plaintiff's chronic mental disorder is "serious and persistent," that is, he has a medically documented history of the existence of the disorder over a period of at least two years; (2) Plaintiff relies on ongoing medical treatment, mental health therapy, psychosocial support, or a highly-structured setting to diminish the symptoms and signs of his mental disorder; and (3) despite Plaintiff's diminished symptoms and signs, he has only marginal adjustment, that is, he has minimal capacity to adapt to changes in his environment or to demands that are not already part of daily life. R. 1993. Plaintiff's impairments would cause him to be absent from work more than four days a month. *Id.* His impairments had lasted or could be expected to last at least twelve months. *Id.* When asked to describe any additional reasons not already discussed why Plaintiff would have difficulty working at a regular job on a sustained basis, Dr. Shahzadi responded, "Patient has poor impulse control[.]" *Id.* According to Dr. Shahzadi, Plaintiff cannot manage benefits in his own interest. *Id.*

### E.   Ravinder Tikoo, M.D.

On September 18, 2019, Ravinder Tikoo, M.D., Plaintiff's treating neurologist,

completed a seven-page check-the-box and fill-in-the-blank medical source statement. R. 1258–

64. Dr. Tikoo had first treated Plaintiff on December 28, 2016, and he treated Plaintiff every two

weeks, most recently on September 11, 2019. R. 1258. Dr. Tikoo diagnosed a herniated disc of

the cervical spine at C5-C6, which "affects the spinal cord, and impresses the existing nerve

root." *Id*. To support this diagnosis, Dr. Tikoo referred to an EMG/NCV taken on February 27,

2019, which revealed left median and bilateral ulnar neuropathy; an EMG/NCV taken on March

27, 2019, which revealed diffuse sensory motor neuropathy; and a transcranial doppler study

("TCD") taken on February 13, 2019, which revealed tachycardia. *Id*. Dr. Tikoo also noted that

Plaintiff suffered from pain, dizziness, and fatigue and that Plaintiff experienced moderate and

severe pain, intermittently, but all the time, in his neck, shoulder, arms, lower back, and bilateral

knees. *Id*. Physical therapy (as well as two other illegible factors) was a precipitating factor

leading to Plaintiff's pain. R. 1259. Lying down, walking, and sitting were other "factors relating

to" Plaintiff's pain. *Id*. (referring again to the February and March 2019 EMG/NCVs and to the

February 2019 TCD). Plaintiff's prescribed medications were "Tylenol #3" and Flexeril (10

mg.); ice also to helped alleviate Plaintiff's symptoms. *Id*. Plaintiff's impairments had lasted or

were expected to last at least twelve months. R. 1260. According to Dr. Tikoo, Plaintiff's

emotional factors–including depression, anxiety, and other psychological factors affecting his

physical condition–contributed to the severity of his symptoms and functional limitations. *Id*.

Plaintiff's impairments (physical i as well as emotional impairments) were reasonably consistent

with the symptoms and functional limitations described in the evaluation. *Id*. Plaintiff's

symptoms and limitations had existed since December 28, 2016. *Id*. According to Dr. Tikoo,

Plaintiff's symptoms were severe enough to interfere with attention and concentration frequently (one-third to two-thirds of an eight-hour day) and Plaintiff was incapable of tolerating even "low stress" jobs. R. 1260−61. As a result of his physical impairments, Plaintiff could walk two to three city blocks without rest; sit and stand continuously for one hour before needing to change position; and walk for one-half hour continuously. R. 1261. Plaintiff could sit and stand/walk for less than one hour total in an eight-hour working day and would require a 15-minute rest break every 15 to 30 minutes during an eight-hour working day. *Id*. Plaintiff would need to lie down for 15 minutes or rest every 15 minutes during an eight-hour working day. R. 1262. Plaintiff does not need a cane or other assistive device. *Id*. Using the following scale: "Rarely/Never" (no sustained period in an eight-hour day); "Occasionally" (less than 1/3 of an eight-hour day); and "Frequently" (between 1/3 and 2/3 of an eight-hour day), Dr. Tikoo opined that Plaintiff could occasionally lift and carry no more than 10 pounds. *Id*. Plaintiff also had "significant limitations" in performing repetitive reaching, handling, or fingering, but could bilaterally grasp, turn, and twist objects, use bilateral fingers for fine manipulation, and bilaterally reach (including overhead) 25% of the time in an eight-hour working day. *Id*. Plaintiff could occasionally perform forward flexion (*i.e.*, look down at a table or desk), but rarely or never perform backward flexion (look up toward the ceiling or sky), rotate right (look sideways to the right), or rotate left (look sideways to the left) during an eight-hour working day. R. 1263. Plaintiff could bend and twist 25% of the time in an eight-hour working day and would require a job that permits ready access to a restroom. *Id*. According to Dr. Tikoo, Plaintiff's impairments were likely to produce "good days" and "bad days" and that Plaintiff was likely to be absent from work more than three times per month as a result of his impairments or treatment. *Id*. Asked whether there were any other limitations that would affect Plaintiff's ability to work at a regular job on a sustained basis, Dr.

Tikoo identified Plaintiff's "psychological limitations" and "need to avoid noise[.]" R. 1264.

## V.    DISCUSSION

Plaintiff argues, *inter alia*, that substantial evidence does not support ALJ Damille's mental and physical RFC determination because he failed to properly consider the opinions of Drs. Starace, Acquaviva, Shahzadi, Tikoo, M.D. *Plaintiff's Memorandum of Law*, ECF No. 19; *Plaintiff's Reply Brief*, ECF No. 21. This Court disagrees.

A claimant's RFC is the most that the claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. §§ 404.1527(e), 404.1546(c), 416.927(e), 416.946(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ must consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation that is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

In the case presently before the Court, ALJ Damille determined that Plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR

26

404.1567(b) and 416.967(b) except stand and/or walk for four hours in an eight-hour day. He can occasionally push and/or pull with the upper and lower extremities. He can occasionally balance, stoop, crouch, and kneel. He can never crawl. He can occasionally reach overhead with the right upper extremity, which is the dominant hand. He must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. He is able to understand, remember and carry out simple instructions. He is restricted to work involving few if any work place changes and free of fast pace production (fast pace is defined as assembly line work). He can have occasional interaction with supervisors. He cannot work in tandem with coworkers and can have no interaction with the public for the purpose of performing work related tasks.

R. 923. In making this determination, ALJ Damille detailed years of record evidence regarding Plaintiff's physical impairments, including, *inter alia*, a March 2009 physical examination which revealed no neck pain with motion and no spinal or back tenderness, intact reflexes, and a normal gait and station; a July 2009 consultative medical examination by Richard Mills, M.D., who observed Plaintiff put his shoes on and off without difficulty and ascend and descend the exam table unassisted and who noted decreased cervical range of motion, zero reflexes in the bilateral lower extremities, and minimal crepitus in his bilateral knees, but intact upper extremity reflexes, intact sensation throughout, and full five out of five motor strength throughout; Plaintiff could also fully extend his hands, make a fist, and oppose all digits with full five out of five grip and pinch strength as well as squat and walk on heels and toes; an X-ray of the lumbar spine showed normal alignment and no osteoarthritic changes and X-rays of the bilateral knees showed moderate medial joint space narrowing and osteoarthritic changes; a December 2011 CT scan of the lumbar spine that showed left paracentral disc protrusion at L3-4 and L5-S1 and diffuse disc bulge at L4-5 associated with narrowing of the spinal canal and neural foramina; an August 2012 examination during which Plaintiff had a nearly full range of motion of the right shoulder and a full range of motion of the left shoulder and bilateral elbows and wrists with full five out of five strength and normal bilateral handgrip strength as well as full range of motion of the bilateral

27

hips, ankles, feet, and toes; although Plaintiff expressed pain with bilateral knee range of motion,

he had normal and free range of movement; Plaintiff had decreased range of motion of the

cervical and lumbar spine with trigger points, but negative straight leg raise testing and a normal

gait and station; a May 2013 MRI of the cervical spine which showed a left-sided herniated disc

at C5-C6 effacing the spinal cord and impressing the exiting nerve root; chiropractic treatment in

late 2012 through 2014 due to complaints of neck and lower back pain but which provided good

relief; a September 2016 hospital admission for opioid detoxification, during which Plaintiff

reported that he was able to perform all activities of daily living and a physical examination

showed normal range of motion of the extremities and no extremity numbness, tingling, or

paresthesias; normal and steady gait; normal coordination; no muscle weakness or deformity;

and equal hand grasps; a December 2016 notation that Plaintiff had been discharged from two

prior pain clinics due to non-compliance with the narcotic contract and, upon examination,

Plaintiff had nearly full range of motion of the right shoulder and full range of motion of the left

shoulder and bilateral elbows and wrists with full five out of five strength and normal bilateral

handgrip strength and full range of motion of his bilateral hips, ankles, feet, and toes; normal and

free range of movement despite expression of pain with bilateral knee range of motion;

decreased range of motion of the cervical and lumbar spine with trigger points, but negative

straight leg raise testing and a normal gait and station; benign findings on neurological

examinations from 2016 through 2019; a December 2014 examination with gastroenterologist

Scott David Lippe, M.D., for chronic pancreatitis, during which Plaintiff was neurologically

nonfocal and had abdominal distention and tenderness, but no hepatosplenomegaly and normal

bowel sounds and no extremity cyanosis, clubbing, or edema; continued benign findings

throughout 2015 and 2016 until Plaintiff was discharged from care in November 2016 due to a

violation of the pain contract; primary care examinations performed at Riverside Medical Group

throughout the period which were unremarkable, including routinely normal bowel sounds and

no distention and, despite occasional complaints of lumbar spine tenderness and positive left

sided straight leg raising, normal neck and musculoskeletal range of motion and no extremity

edema or deformity. R. 924−26. ALJ Damille also considered Plaintiff's body mass index of

30.3 in determining Plaintiff's RFC. R. 926.

In considering Plaintiff's mental impairments, ALJ Damille stated, *inter alia*, that he was

"cognizant of the substantial overlap in symptomology between different mental impairments, as

well as the inherently subjective nature of mental diagnoses" and, therefore, Plaintiff's

"psychological symptoms and their effect on his functioning have been considered together,

instead of separately, regardless of the diagnostic label attached." R. 926. ALJ Damille went on

to detail years of record evidence regarding Plaintiff's mental impairments, including, *inter alia*,

evidence that on February 25, 2009, Plaintiff was admitted to a MICA program when it was

noted that he had attended all meetings and had remained free of suicidal or homicidal ideation

and free of drug use; that on April 30, 2009, Plaintiff was discharged from the program and

instructed to follow-up at Bergen Regional Medical Center Outpatient Clinic and, throughout the

remainder of 2009, Plaintiff presented as stable, alert and oriented times three, calm, kempt, and

cooperative with mood ranging from anxious to good and he denied suicidal/homicidal ideation,

delusions, and auditory/visual hallucinations; that in December 2009, Plaintiff was discharged

from treatment due to noncompliance; that during a June 2009 consultative psychological

examination by Harold Goldstein, Ph.D., Plaintiff was irritable but cooperative, with no evidence

of a psychomotor impairment or thought disorder, was coherent and logical, and denied any

hallucinations or suicidal ideation; Plaintiff also had adequate social judgment and was oriented times three, recalled two out of three words after five minutes, and recalled four digits forwards and three backwards; Dr. Goldstein noted that Plaintiff had good fund of knowledge and was able to correctly spell several five letter words backwards, had intact abstract reasoning, and had no difficulty recalling information from several days prior; that psychotherapy progress notes from 2010 through 2015 from Bergen Regional Medical Center were generally unremarkable, including presenting as appropriate, with normal speech, coherent, with goal directed thought processes, intact thought associations, no suicidal ideation, and no delusions or hallucinations as well as being alert and oriented times three with an anxious to euthymic mood, full to appropriate affect, fair judgment, moderate insight, intact memory, intact attention span and concentration, and intact general knowledge; including the finding that Plaintiff was stable when compliant with his medication regime; that on September 8, 2016, Plaintiff was admitted to Bergen Regional Medical Center for opioid dependence and detoxification; that Plaintiff attended group meetings, socialized with peers, and tolerated the detox process; that during the five-day admission, Plaintiff was calm, pleasant, alert and oriented times three, spoke clearly, followed commands, and responded to visual and auditory stimuli; that during a September 2016 follow-up, Plaintiff was agitated, aggressive, and medication seeking, but he denied any stressors, was eating and sleeping well, was stable on current medication, and that he had more energy and was able to concentrate at work; that in March 2017, Plaintiff was transported to the Bergen Regional Medical Center emergency department because he was threatening suicide; that on examination, Plaintiff was disheveled and superficially cooperative with fair to good eye contact and pressured speech and tangential thought associations, his thought processes were grossly coherent, his computations were age appropriate, and his abstractions were normal; he

had poor judgment and minimum insight, but he denied auditory or visual hallucinations and he was oriented times three with intact memory and intact attention span; that he was discharged that same day and was instructed to engage in outpatient treatment; that during a May 2017 seven day hospitalization for addiction treatment, it was observed that Plaintiff attended group meetings, socialized with peers, and tolerated the detox process, presented as calm, pleasant, and alert and oriented times three with clear speech and an ability to follow commands; that during a May 2017 outpatient mental health examination, Plaintiff was stable on his current medication regimen; that in September 2017, Plaintiff reported some improvement in his anxiety and depression and he denied any suicidal ideation, delusions, and psychosis; that in September 2018, Plaintiff denied any overt symptoms of depression, mania, or psychosis; that during a March 2019 examination, Plaintiff endorsed symptoms of depression, but he denied suicidal ideation and perceptual disturbances; that during a September 2019 psychotherapy examination, Plaintiff was confrontational and required redirection during the evaluation and on mental status examination, Plaintiff had a depressed mood and full affect, coherent thought processes, intact thought associations, moderate insight, and fair judgment and it was noted that Plaintiff was stable; that the opinion of Dr. Starace, the state agency psychological consultant, was entitled to "good weight." R. 926−29. ALJ Damille went on to explain that, even considering Plaintiff's history of substance abuse, he "does not have disabling limitations, and thus substance abuse is not material in this case. I have considered all of [Plaintiff's] mental health impairments, singularly and in combination, including his substance abuse and the applicability of SSR 13-2p, and reflected appropriate limitations in the residual functional capacity above." R. 928. In the view of this Court, this record contains substantial evidence to support the ALJ's RFC

determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*, 186 F.3d at 429.

Plaintiff, however, challenges this determination on a number of bases, which the Court addresses in turn.

### A.     Mental RFC and Opinion Evidence

Plaintiff first contends that substantial evidence does not support the mental RFC because ALJ Damille erred in weighing Dr. Starace's opinion. *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 6–10; *Plaintiff's Reply Brief*, ECF No. 21, pp. 2–3. This Court disagrees.

An ALJ must evaluate all record evidence in making a disability determination. *Plummer,* 186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence. *Id*. at 705–06; *Diaz v. Comm'r of Soc. Sec*., 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

State agency physicians are experts in Social Security disability programs. SSR 96-6p. "An ALJ may not ignore these opinions and must explain the weight given to them." *Neal v.*

*Comm'r of Soc. Sec.*, 57 F. App'x 976, 979 (3d Cir. 2003). An ALJ may rely on a state agency physician's findings and conclusions even where there is a lapse of time between the state agency report and the ALJ's decision and where additional medical evidence is later submitted. *Chandler,* 667 F.3d at 361 ("The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing,' is an update to the report required.") (emphasis in original) (citations omitted); *Wilson v. Astrue*, 331 F. App'x 917, 919 (3d Cir. 2009) ("Generally, an ALJ is required to consider the reports of State agency medical consultants; however, there is no requirement that an ALJ must always receive an updated report from the State medical experts whenever new medical evidence is available.").

In the case presently before the Court, ALJ Damille assigned "good weight" to Dr. Starace's opinion, reasoning as follows:

> In June 2009, State agency psychological consultant, Robert Starace, Ph.D. opined that the claimant had no more that moderate limitations and the overall evidence of record supported that the claimant could understand, remember, and execute simple routine instructions and tasks; sustain concentration, pace, and persistence; adequately socially interact; and adapt to changes (3F; 4F). I afford good weight to the opinion of Dr. Starace, as he is a State agency consultant who has program knowledge of the Administration's standards and procedures. Moreover, Dr. Starace's opinion is consistent with the benign mental status examination findings of record that include the claimant had intact memory, intact attention and concentration, and no hallucinations or delusions (26F/7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 34, 39-40, 77, 80, 83, 92-93, 96-97, 101-102, 104-105, 109-110, 112-113, 121-122, 125, 131, 136, 141, 146, 150, 154). However, based on the claimant's complaints of social interaction limitations and difficulty with task completion and persistence, I find it necessary to restrict the claimant's social interactions with coworkers and the public in a workplace free of fast pace production and few work place changes, in order to avoid an exacerbation of his mania, depression, and anxiety.

R. 929. Plaintiff challenges this assessment, arguing that Dr. Starace's opinion was issued eleven years before ALJ Damille's decision and therefore provides no insight into Plaintiff's current functioning, arguing that the record post-dating Dr. Starace's 2009 opinion reflects a change for the worse in Plaintiff's mental impairments. *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 8–9 (citing R. 746–891, 1472, 1982); *Plaintiff's Reply Brief*, ECF No. 21, pp. 2–3. Plaintiff also contends that "[t]his circuit has said that such non-examining, stale opinions are 'virtually worthless.'" *Plaintiff's Memorandum of Law*, ECF No. 19, p. 8 (quoting *Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 963–64 (3d Cir. 1984); citing *Egan v. Astrue*, No. CIV. 10-5150 RMB, 2011 WL 6935275, at *5 (D.N.J. Dec. 29, 2011)).

Plaintiff's arguments are not well taken. As set forth above, ALJ Damille did not err when assigning "good weight" to Dr. Starace's opinion issued in September 2009 simply because it pre-dated that ALJ's decision and because additional medical evidence was later submitted. *See Chandler*, 667 F.3d at 361; *Wilson*, 331 F. App'x at 919. Moreover, "[s]imply because these opinions were rendered by state agency physicians who did not have a treating relationship with Plaintiff does not, as discussed in the aforementioned precedent, mean that the ALJ could not give them significant weight[.]" *Jones v. Colvin*, No. 3:14-CV-2337, 2016 WL 1071021, at *12 (M.D. Pa. Mar. 17, 2016); *cf. Chandler*, 667 F.3d at 361 ("State agent opinions merit significant consideration").[5] Although Plaintiff points to medical evidence generated after

---

[5] Plaintiff's reliance on *Wier* and *Egan* are inapposite. *Plaintiff's Memorandum of Law*, ECF No. 19, p. 8. Plaintiff cites to *Wier* apparently for the proposition that all state agency opinions issued years before an ALJ decision are "virtually worthless[,]" *see id.*, that case is factually distinct. The state agency opinions in that case were issued when that claimant, who was "well past eighteen . . . when his case is finally adjudicated properly[,]" was only eleven years old. *Wier*, 734 F.2d at 956, 964. The court in *Wier* found that "[i]n a case involving an adolescent, where medical and psychological problems often change rapidly, reliance on this sort of evidence is highly suspect. *The staleness of the reports cannot be measured by their age alone*, however. . . . There is also evidence in the record that would suggest that appellant's mental development

Dr. Starace provided his opinion, the Court is not persuaded that such evidence requires remand. For example, Plaintiff contends that the evidence generated after Dr. Starace had rendered his opinion "showed [that] Plaintiff consistently had an abnormal mood and affect[.]" *Plaintiff's Memorandum of Law*, ECF No. 19, p. 8 (citing R. 746–891). Setting aside the fact that Plaintiff refers to nearly 150 pages of record evidence without specific citation to where evidence of abnormal mood and affect may be found, *see id.*; *see also Atkins on behalf of Atkins v. Comm'r Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) ("'[J]udges are not like pigs, hunting for truffles buried in the record.'") (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006)) (internal citation omitted)), ALJ Damille explained that other evidence post-dating Dr. Starace's 2009 opinion—such as "benign mental status examination findings of record that include the claimant had intact memory, intact attention and concentration, and no hallucinations or delusions"—was consistent with that opinion. R. 929 (providing specific citation to pages spanning years of evidence). Plaintiff also points to post-opinion evidence that he "was brought to the hospital by the police for suicidal actions (T 1472), and had aggressive outbursts (*see* T 1982)[,]" *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 8–9, but the ALJ expressly considered this evidence when fashioning the RFC. R. 927 ("On March 8, 2017, the police took the claimant to the Bergen Regional Medical Center emergency department because he was threatening suicide[.]"), 928 ("During a September 2019 psychotherapy examination, the claimant was confrontational and required redirection during the evaluation (32F/16 [R. 1982])."). The Court "will uphold the ALJ's decision even if there is contrary evidence that

---

relative to his chronological age has slowed in adolescence." *Id*. at 964 (emphasis added). In *Egan*, the state agency opinions were "the only evidence potentially inconsistent" with a later medical opinion. *Egan*, 2011 WL 6935275, at *5. Conversely, in the present case, ALJ Damille explained that more recent evidence also supported Dr. Starace's opinion. R. 929.

would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also Chandler*, 667 F.3d at 359 ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard].")*; Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Notably, Plaintiff fails to explain how any specific medical evidence later submitted would result in a different mental RFC or an award of benefits. *See Plaintiff's Memorandum of Law*, ECF No. 19, pp. 8–9; *see also Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling caused harm."); *Padgett v. Comm'r of Soc. Sec.*, No. CV 16-9441, 2018 WL 1399307, at *2 (D.N.J. Mar. 20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the Court does not understand what argument Plaintiff has made here. Plaintiff has done no more than thrown down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them together. The Court does not assemble arguments for a party from fragments.").

Plaintiff also challenges ALJ Damille's consideration of the opinions of his treating physicians, Drs. Acquaviva and Shahzadi (collectively, "the treating physicians"). *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 11–17. For claims filed before March 27, 2017,[6] "'[a]

---

[6] As previously noted, Plaintiff's claim was filed on March 30, 2009. For claims filed after March 27, 2017, the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. §§ 404.1527, 416.927 *with*

cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (stating that an ALJ should give treating physicians' opinions "great weight") (citations omitted); *Fargnoli*, 247 F.3d at 43 (3d Cir. 2001) (stating that a treating physician's opinions "are entitled to substantial and at times even controlling weight") (citations omitted). However, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record."). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (internal quotation marks and citations omitted). The ALJ must consider the following factors when deciding what weight to accord the opinion of a treating physician: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the

---

20 C.F.R. §§ 404.1520c(a), 416.927c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources").

supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating source's specialization; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6). Accordingly, "the ALJ still may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (quoting *Morales*, 225 F.3d at 317); *see also Nazario*, 794 F. App'x at 209–10 ("We have also held that although the government 'may properly accept some parts of the medical evidence and reject other parts,' the government must 'provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.'") (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)); *Morales*, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit[.]"); *Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") (internal citation omitted).

In the case presently before the Court, ALJ Damille considered the opinions of Dr. Acquaviva and Dr. Shahzadi, but assigned them "little weight[,]" reasoning as follows:

> In November 2009, psychiatrist John Acquaviva, M.D. opined that the claimant had a fair ability to make and carry out very simple instructions; to accept instructions and respond appropriately; and to respond appropriately to changes made in a work setting. Dr. Acquaviva further opined that the claimant had a poor ability to deal with normal work stress; to perform at a consistent pace; work with others; complete a normal workday without interruptions from symptoms; and remember work like procedures (13F). In March 2011 and September 2015, Dr. Acquaviva assessed that the claimant had an inadequate to no ability to perform unskilled work activities. Dr. Acquaviva further opined that the claimant would be absent more than three days per month and he had none to slight limitations with activities of daily living; slight to moderate limitations maintaining social functioning; frequent

limitations with concentration, persistence and pace; and repeated episodes of decompensation (18F; 25F/6-12; 27F/6-12).

I have considered these various assessment from Dr. Acquaviva and afford them little weight. While Dr. Acquaviva is a treating source, the record contains *scant progress notes from him documenting significant positive mental status finding that might serve as the basis for the profound limitations he opines. For example, the claimant routinely presented with intact thought content and associations, intact memory, and intact attention and concentration* (26F/7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 34, 39-40, 77, 80, 83, 92-93, 96-97, 101-102, 104-105, 109-110, 112-113, 121-122, 125, 131, 136, 141, 146, 150, 154). Moreover, it was routinely observed that the *claimant's mental symptomology was stable when compliant with medication* (26F/7, 26, 77, 87, 91, 104, 108, 160). Accordingly, I find that although the record certainly establishes meaningful limitations that would preclude the claimant from performing more than unskilled work activities, it does not support the highly compromised functions reflected in Dr. Acquaviva's opinions. In addition, in September 2015, Dr. Acquaviva assessed that the combination of the claimant's physical and mental conditions made it difficult for the claimant to pursue any kind of regular employment (25F/1; 27F/1). Little weight is assigned to this opinion, as it is a broad overly conclusory statement on an issue reserved to the Commissioner and a specific assessment of mental limitations was not provided.

In January 2020, psychiatrist Ulfat Shahzadi, M.D. opined that the claimant would be absent more than four days per month and he had extreme limitations in interacting with others, persisting, adapting in the workplace, and managing himself. Dr. Shahzadi further assessed that the claimant had none to mild limitations understanding, remembering, and applying information and moderate limitations concentrating and maintaining pace (33F). This opinion is afforded little weight, as Dr. Shahzadi's *limitations are not supported by the unremarkable mental status examination findings of record in conjunction with treatment notes showing that the claimant's symptoms were controlled when medication compliant* (26F/7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 34, 39-40, 77, 80, 83, 92-93, 96-97, 101-102, 104-105, 109-110, 112-113, 121-122, 125, 131, 136, 141, 146, 150, 154).

R. 929−30 (emphasis added).

Plaintiff complains that substantial evidence does not support ALJ Damille's two reasons−"normal objective examination findings" or "benign mental status findings" and that Plaintiff was "'stable' with medication"−for discounting these opinions. *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 12−17. Plaintiff first contends that the ALJ selectively chose benign findings in the record, engaging in impermissible cherry picking. *Id*. at 12, 14−15. This Court

disagrees. As previously detailed, ALJ Damille specifically acknowledged evidence that Plaintiff would presumably construe as supportive of the treating physicians' opinions. *See, e.g.*, R. 926 (noting that findings throughout 2009 included anxious mood and that Dr. Goldstein, in his June 2009 consultative psychological examination, noted irritability), 927 (noting that in September 2016 Plaintiff was observed as agitated, aggressive, and medication-seeking and that in March 2017, police took Plaintiff to the emergency department because he was threatening suicide), 928 (noting that Plaintiff endorsed symptoms of depression in March 2019, and that in September 2019, Plaintiff was confrontational and required redirection during a psychotherapy evaluation). However, as set forth above, the ALJ also detailed years of other evidence that reflected unremarkable and benign examination findings. R. 926−30. Based on this record, ALJ Damille appropriately considered the objective mental health evidence and did not engage in impermissible cherry picking. *See Hatton*, 131 F. App'x at 880 (finding that the trier of fact has the duty to resolve conflicting medical evidence); *Davison v. Comm'r of Soc. Sec.*, No. CV 18-15840, 2020 WL 3638414, at *8 (D.N.J. July 6, 2020) ("The ALJ cited to multiple other reports and surveyed a significant amount of evidence. He was not required to discuss or describe every page of the record. He did not, as [the claimant] seems to suggest, cherry pick a handful of positive statements out of a universe of negative statements."); *Lewis v. Comm'r of Soc. Sec.*, No. 15CV06275, 2017 WL 6329703, at *8 (D.N.J. Dec. 11, 2017) ("Though the Plaintiff accuses the ALJ of cherry-picking evidence, it actually appears that the Plaintiff is the one guilty of cherry-picking since the bulk of the medical record seems to indicate minimal issues with executive function and mental capabilities."). Moreover, normal findings upon mental status examination devoid of hallucinations, delusions, or paranoia can provide substantial support for an ALJ's evaluation of a medical opinion and RFC determination. *See Brady v. Kijakazi*, No.

1:20-CV-00852, 2021 WL 5179140, at *5 (M.D. Pa. Nov. 8, 2021) (finding that "substantial

evidence supports the ALJ's evaluation of Dr. Berger's opinion" of assigning no weight to that

opinion where the ALJ, *inter alia*, pointed to the mental status examinations "that recorded [the

claimant's] cooperative attitude; good eye contact; relevant and coherent thought processes,

intact language processing; intact associative thinking; alert and oriented behavior; intact

immediate, recent, and remote memory skills; intact judgment; intact to lacking insight; and no

evidence of delusions, hallucinations, obsessions, preoccupations, or somatic thoughts"); *Bonner

v. Saul*, No. 1:19-CV-1370, 2020 WL 4041052, at *15 (M.D. Pa. July 17, 2020) (finding that

substantial evidence supported the ALJ's RFC determination where "[w]ith regard to Bonner's

mental health impairments, the ALJ explained that the medical record demonstrated relatively

normal mental status findings, including that Bonner exhibited coherent thought processes, a

normal attitude and affect, good insight, normal thought content, intact recent and remote

memory, and intact cognitive functioning"); *Pohl v. Berryhill*, No. 3:18-CV-11675, 2019 WL

3886974, at *7 (D.N.J. Aug. 19, 2019) (finding that the ALJ's weighing of a medical opinion "is

also well supported by substantial medical evidence in the record[,]" including that the

claimant's "mental health examinations were unremarkable and she routinely denied ever

experiencing delusions, hallucinations, or suicidal thoughts"); *Miranda v. Berryhill*, No. CV 18-

694, 2018 WL 4038111, at *5 (E.D. Pa. Aug. 23, 2018) ("ALJ Timm's decision to give partial

weight to Dr. Mullins' diagnosis of 'anxiety/depression' is supported by the record because he

concluded it is based on Ms. Miranda's subjective complaints rather than Dr. Mullins'

examination where Ms. Miranda appeared oriented, appropriately dressed, and had good eye

contact with no evidence of hallucinations, delusions, impaired judgment, or significant memory

impairment."). The Court therefore declines Plaintiff's invitation to re-weigh the evidence or to

impose Plaintiff's or this Court's own factual determination. *See Chandler*, 667 F.3d at 359; *Zirnsak*, 777 F.3d at 611 (stating that a reviewing court "must not substitute [its] own judgment for that of the fact finder").

To the extent that Plaintiff suggests that the diagnosis of bipolar disorder undermines ALJ Damille's consideration of the treating physicians' opinions, *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 12–14, Plaintiff's argument is not well taken. Plaintiff simply points to this diagnosis without identifying any additional functional limitations not already included in the RFC, nor does he provide any explanation as to why this evidence undermines ALJ Damille's consideration of the treating physicians' opinions or otherwise requires remand. *See id*. Notably, "[a] diagnosis alone . . . does not demonstrate disability." *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009) (citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)); *see also Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act"). Notably, as previously discussed, an ALJ need include only "credibly established" limitations, *i.e.*, limitations "that are medically supported and otherwise uncontroverted in the record." *Rutherford*, 399 F.3d at 554; *see also Grella v. Colvin*, No. 3:12-CV-02115-GBC, 2014 WL 4437640, at *18 (M.D. Pa. Sept. 9, 2014) ("[T]he ALJ cannot accommodate limitations which do not exist, or which cannot be found in the medical record. No specific functional limitations were provided by any of Plaintiff's medical sources with respect to her carpal tunnel syndrome[.]") (internal citation and quotation marks omitted). In any event, ALJ Damille specifically considered Plaintiff's bipolar disorder throughout the sequential evaluation process, finding it to be a severe impairment at step two, R.

42

920, explaining why it did not meet or medically equal a listed impairment at step three, R. 921–

23, and considering this disorder when fashioning the RFC at step four, R. 926, 928; *cf. Hess v.*

*Comm'r Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) (explaining that "no incantations are

required at steps four and five simply because a particular finding has been made at steps two

and three. Those portions of the disability analysis serve distinct purposes and may be expressed

in different ways" and, therefore, "the findings at steps two and three will not necessarily

translate to the language used at steps four and five").

      In continuing to attack ALJ Damille's reasoning in discounting the treating physicians'

opinions, Plaintiff argues that the "second line of reasoning[,] that Plaintiff was 'stable' with

medication[,] . . . too must fail." *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 15–16.

Plaintiff specifically argues that a notation that a claimant is stable with medication is not a basis

for rejecting a treating physician's opinion and that the use of the term "stable" "does not mean

that Plaintiff's mental impairments were not problematic; just unchanged." *Id.* at 15–16 (citing,

*inter alia*, *Nazario,* 794 F. App'x at 211 (quoting *Morales*, 225 F.3d at 320)). Plaintiff's

argument is not well taken. As a preliminary matter, as detailed above, the fact that Plaintiff's

symptoms were characterized as "stable" on medication was only one factor that ALJ Damille

identified when explaining why he discounted the more extreme opinions of Drs. Acquaviva and

Shahzadi. R. 929–30.

      It is true that "stability does not equate to a specific medical condition. Indeed, someone

can be stable with a chronic disabling malady or stable on a particular day or in a certain

environment." *Nazario*, 794 F. App'x at 211. Similarly, the fact that a claimant is "stable and

well controlled with medication" does not necessarily establish that a claimant can return to

work. *Morales*, 225 F.3d at 319 (internal quotation marks omitted). In the present case, however,

and unlike the reasoning of the ALJ in *Morales*, ALJ Damille "did not inappropriately reject the treating physician[s'] opinion[s] on the basis of credibility judgments, speculation, or lay opinion." *Torres v. Barnhart*, 139 F. App'x 411, 415 (3d Cir. 2005). Instead, as detailed above, ALJ Damille's "finding was based on the objective medical evidence contained in the psychotherapy treatment notes, and is not 'overwhelmed' by contrary evidence in the record." *Id.* (citing *Morales*, 225 F.3d at 320); *see also Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 121 (3d Cir. 2020) (finding ALJ was "entitled to discount" a treating source's earlier assessment "where it was undermined by the more 'detailed, longitudinal picture" provided by his later medical assessments[,]" which revealed that the claimant was "consistently calm and cooperative upon exam, and her prognosis was 'good'" and objective evidence supported the ALJ's finding that mental impairments did not prevent the claimant from engaging in substantial gainful activity where "she was consistently noted to be calm and cooperative, reportedly got along with immediate family, friends, and neighbors, could shop in stores by herself, attended community events, and had consistently normal findings with her cognition, memory, speech, judgment and insight"); *Hernandez v. Saul*, No. 4:19-CV-1263, 2020 WL 3412687, at *14 (M.D. Pa. June 22, 2020) ("Unlike in *Morales*, the ALJ in this case cited to evidence in the record including Plaintiff's mental health treatment records and the opinions of doctors Davis [consultative examiner] and Siegel [state agency reviewing physician] (to whose opinions he accorded great weight) before concluding that Plaintiff was not disabled. Accordingly, I am not persuaded that remand is required under *Morales*."); *Bucci for & on Behalf of Eland v. Saul*, No. CV 19-368, 2020 WL 709516, at *6 (W.D. Pa. Feb. 12, 2020) (affirming denial of benefits where "more than a scintilla of evidence supports the ALJ's conclusions[,]" including, *inter alia*, that "Plaintiff exhibited stable mental health when he complied with medication"); *Adorno v. Berryhill*, No. CV

44

15-4269, 2017 WL 6731623, at *10 (E.D. Pa. Dec. 29, 2017) (finding that substantial evidence supported the ALJ's decision where, *inter alia*, the claimant did not cast "doubt on medical records showing that when she participated in "active psychotherapy," she was "relatively stable" and that "[u]nlike in *Morales*, there is no medical evidence clearly supporting a finding that [the claimant] is unable to work. Rather, [the claimant's] medical records support the ALJ's finding that she is able to work, albeit with limitations").

Finally, in continuing to challenge the RFC determination, Plaintiff argues that the ALJ also erred in his consideration of Plaintiff's global assessment of functioning ("GAF") scores. *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 10−11; *Plaintiff's Reply Brief*, ECF No. 21, p. 3. The ALJ assigned "some weight" to this evidence, reasoning as follows:

> In addition, the evidence also reveals that the claimant was assigned global assessment of functioning (GAF) scores of 50 to 60 throughout his treatment, indicating only mild to moderate symptoms (2F; 12F/9; 13F; 18F; 25F; 26F; 30F/211). I accords [sic] these snapshot assessments some weight, noting that, generally GAF scores represent a subjective interpretation of the claimant's general functioning at the particular time of the assessment. Accordingly, GAF scores are vague, one-time assessments of the claimant's general symptomology and do not represent the claimant's overall functioning over any significant period of time.

R. 930. Plaintiff contends that GAF scores have been discredited and that ALJ Damille should not have assigned even "some weight" to them. *Plaintiff's Memorandum of Law*, ECF No. 19, p. 10. Plaintiff observes that even ALJ Damille acknowledged that GAF scores have been discredited and argues that ALJ Damille should have explained and justified why he afforded such scores even "some weight." *Id*. at 10−11; *see also Plaintiff's Reply Brief*, ECF No. 21, p. 3. Even if (and the Court does not so conclude) the ALJ erred in assigning "some weight" to the GAF scores without an adequate explanation, the Court is not persuaded that this issue requires remand. Although "the Diagnostic and Statistical Manual of Mental Disorders, DSM-5, abandoned the GAF scale as a measurement tool" and a GAF score is not dispositive of

disability, "the Social Security Administration now permits ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders[.]" *Hughes v. Comm'r Soc. Sec.*, 643 F. App'x 116, 119 n.2 (3d Cir. 2016) (stating further that "an ALJ should not 'give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence'") (quoting SSA AM–13066 at 5 (July 13, 2013)); *cf. Gilroy v. Astrue*, 351 F. App'x 714, 715–16 (3d Cir. 2009) ("A GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings[.]") (citations omitted); *Black v. Comm'r of Soc. Sec.*, No. 1:19-CV-17237, 2020 WL 4727274, at *6 (D.N.J. Aug. 14, 2020) ("A GAF score is evidence that is to be assessed like all other medical evidence in the record, and the weight of its impact on a claimant's RFC depends on whether it is well supported and not inconsistent with other evidence.").

        In the present case, ALJ Damille did not assign controlling weight to Plaintiff's GAF scores nor did he find them to be dispositive of the issue of disability; these scores were simply one of many factors that the ALJ considered when he crafted the RFC. R. 924–30. Moreover, Plaintiff has not explained how the ALJ's consideration of these scores requires any different or additional functional limitations not already included in the RFC or why the alleged error otherwise requires remand. *See Plaintiff's Memorandum of Law*, ECF No. 19, pp. 10–11; *Plaintiff's Reply Brief*, ECF No. 21, p. 3. Therefore, even if ALJ Damille erred in assigning "some weight" to the GAF scores, any alleged error is harmless and will not serve as a basis for undermining the RFC and remanding this action. *See Shinseki*, 556 U.S. at 409–10; *Pickerin v. Colvin*, No. 14-6130, 2016 WL 5745103, at *5 (D.N.J. Sept. 30, 2016) (affirming the ALJ decision where "Plaintiff does not offer any specific limitations that the ALJ should have included in the RFC assessment . . . [and b]ecause it is Plaintiff's burden to show that the ALJ's

finding of residual functional capacity was not supported by substantial evidence, and Plaintiff has not identified any specific error").

In short, the Court concludes that the ALJ's findings regarding Plaintiff's mental RFC are consistent with the evidence and enjoy substantial support in the record, as does his consideration of the opinions of Drs. Starace, Acquaviva, and Shahzadi.[7]

## B.     Physical RFC and Opinion Evidence

Plaintiff also contends that substantial evidence does not support the physical RFC determination because ALJ Damille erred in weighing the opinions of the reviewing state agency medical consultant, Dr. Cortijo. *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 17−19; *Plaintiff's Reply Brief*, ECF No. 21, pp. 3−4. Plaintiff's arguments are not well taken.

ALJ Damille assigned "partial weight" to Dr. Cortijo's opinions, reasoning as follows:

As for the opinion evidence, in August 2009, State agency medical consultant, Benjamin Cortijo, M.D. opined that the claimant could perform light work with occasional postural limitations (8F). In December 2009, Frederick B. Cohen, M.D. affirmed the opinion of Dr. Cortijo (14F). Although treatment notes and physical examinations do not support a need for a restriction from standing and walking for six hours in an eight-hour workday, I find that the claimant is best suited to standing/walking for four hours in and eight-hour workday. Accordingly, I afford partial weight to these opinions finding additional, exertional, pushing/pulling, postural, and reaching limitations necessary in order to avoid an exacerbation of the claimant's neck, back, and bilateral knee pain. Furthermore, I find it necessary to afford the claimant environmental limitations due to potential medication side effects. Of note, while the claimant has endorsed an inability to stand, walk, and sit for prolonged periods of time and an inability to reach overhead with the right upper extremity, the claimant's physical examination findings routinely include that he

---

[7] At the end of his argument regarding his mental RFC, Plaintiff asserts in conclusory fashion that the opinions of Drs. Acquaviva and Shahzadi establish that he "would meet listings 12.04, 12.06, 12.08." *Plaintiff's Memorandum of Law*, ECF No. 19, p. 17. However, Plaintiff, who bears the burden of proof at step three, offers no substantive analysis of the evidence relative to these listings. *See id*. The Court therefore finds no merit in Plaintiff's undeveloped argument in this regard. *See Wright v. Comm'r Soc. Sec.*, 783 F. App'x 243, 245 (3d Cir. 2019) ("We need not address this conclusory, undeveloped accusation.") (citations omitted); *Padgett*, 2018 WL 1399307, at *2.

had intact sensation and motor strength and an intact gait and station (30F/194; 35F/7, 46, 167-168; 36F/236, 247).

R. 928. In challenging ALJ Damille's determination in this regard, Plaintiff argues that Dr. Cortijo's opinions were stale and were based on only a limited record and, therefore, "just as with the mental consultant's determination, this physical determination is 'virtually worthless' and cannot provide substantial evidence." *Plaintiff's Memorandum of Law*, ECF No. 19, p. 18 (quoting *Wier*, 734 F.2d at 963−64); *see also Plaintiff's Reply Brief*, ECF No. 21, pp. 3−4. However, as discussed earlier in connection with the opinions of Drs. Acquaviva and Shahzadi, Dr. Cortijo's opinions are not stale or worthless[8] simply because they pre-dated the ALJ's decision and because additional medical evidence was later submitted. *See Chandler*, 667 F.3d at 361; *Wilson*, 331 F. App'x at 919. Plaintiff also emphasizes that Dr. Cortijo "only had one treatment note regarding Plaintiff's physical impairments [specifically, regarding Plaintiff's nose] available for review aside from the [consultative examiner's] report." *Plaintiff's Memorandum of Law*, ECF No. 19, p. 18. Notably, Plaintiff fails to explain how any specific later-submitted medical evidence would change Dr. Cortijo's opinion, would result in a different physical RFC, or would require remand or an award of benefits. *See Plaintiff's Memorandum of Law*, ECF No. 19, pp. 17−18; *Plaintiff's Reply Brief*, ECF No. 21, pp. 3−4; *see also Shinseki*, 556 U.S. at 409−10.

Plaintiff goes on to argue that ALJ Damille improperly failed to explain the weight assigned to Dr. Cortijo's opinions. *Plaintiff's Memorandum of Law*, ECF No. 19, p. 18−19. This Court disagrees. A fair reading of his decision makes clear that, in assigning "partial weight" to Dr. Cortijo's opinions, ALJ Damille implicitly explained how record evidence supported or

---

[8] For the reasons discussed earlier in this Opinion and Order, Plaintiff's reliance on *Wier* is inapposite.

failed to support the degree of limitations expressed in those opinions. R. 928 (noting, *inter alia*, how "treatment notes and physical examinations do not support a need for a restriction from standing and walking for six hours in an eight-hour workday[;]" how evidence of pain warrants additional postural limitations; how potential medication side effects warrant environmental limitations; and how physical examination findings that routinely include intact sensation, motor strength, gait, and station do not warrant greater limitations of standing, walking, sitting, or reaching than those limitations in the RFC); *see also* 20 C.F.R. §§ 404.1527(c)(3), (4), (6), 416.927(c)(3), (4), (6). To the extent that Plaintiff suggests that ALJ Damille improperly relied on his lay opinion in weighing Dr. Cortijo's opinion or in crafting the physical RFC, *Plaintiff's Memorandum of Law*, ECF No. 19, p. 19, the Court notes that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 Fed. App'x 6, 11 (3d Cir. 2006); *see also Chandler*, 667 F.3d at 362 (stating that an ALJ "is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision"); *cf. Glass v. Comm'r of Soc. Sec.*, No. CV 18-15279, 2019 WL 5617508, at *8 (D.N.J. Oct. 31, 2019) ("[T]he United States Court of Appeals for the Third Circuit does not require an ALJ to perform a 'function-by-function' analysis at step four, so long as the ALJ's RFC determination is supported by substantial evidence in the record.") (collecting cases). In any event, as explained above, ALJ Damille did not simply rely on his lay opinion when considering Dr. Cortijo's opinions or in determining Plaintiff's physical RFC; instead, he detailed years of medical evidence and hearing testimony, as discussed above. R. 924−26, 928.

In continuing to challenge the physical RFC, Plaintiff also argues that ALJ Damille erred in weighing the opinions of Plaintiff's treating neurologist, Dr. Tikoo. *Plaintiff's Memorandum*

*of Law*, ECF No. 19, pp. 19−21. For the reasons that follow, Plaintiff's arguments are not well

taken.

> ALJ Damille assigned "little weight" to Dr. Tikoo's opinions, reasoning as follows:
>
> In September 2019, Dr. Tikoo opined that the claimant could sit, stand, and walk for less than one hour in an eight-hour workday and lift/carry up to ten pounds with significant postural, reaching, and manipulative limitations (29F). Dr. Tikoo further opined that the claimant would be absent more than three times per month and he had psychological limitations and needed to avoid noise (*Id.*). The opinion of Dr. Tikoo is afforded little weight. While Dr. Tikoo is a treating source, the record contains scant progress notes from him documenting significant clinical findings that might serve as the basis for the profound limitations he opines. Specifically, in December 2016 and April 2018, Dr. Tikoo observed that the claimant had intact deep tendon reflexes; normal motor bulk, tone, strength throughout; no atrophy, fasciculations, or adventitious movements; intact sensation in all extremities; normal coordination; and a normal gait (35F/7, 46, 167-168; 36F/236, 247). Moreover, the record also shows that the claimant's neck, back, and knee symptoms have been managed rather routinely and conservatively, with only pain medications and some chiropractic treatment, which seems at odds with the remarkably diminished functioning assessed by Dr. Tikoo. Accordingly, I find that although the record certainly establishes meaningful limitations that would preclude the claimant from performing more than a reduced range of light work, it does not support the highly compromised functions reflected in Dr. Tikoo's opinion.

R. 928−29. The Court finds no error in ALJ Damille's reasoning in this regard. *See* 20 C.F.R. §§

404.1527(c)(2), (3), (4), (6), 416.927(c)(2), (3), (4), (6); *Brunson v. Comm'r of Soc. Sec.*, 704 F.

App'x 56, 59−60 (3d Cir. 2017) (finding that the ALJ "appropriately gave less weight" to

medical opinions where although one physician concluded the plaintiff "was limited in his work

abilities, his report lacked adequate support for this determination" and where that physician's

"conclusion conflicted with both [the plaintiff's] self-reported daily activities and [the

physician's] own positive reports after [] surgery," and where the ALJ discounted another

physician's opinion as "inconsistent with the record evidence[,]" including that physician's "own

findings that [the plaintiff] maintained normal grip strength and intact reflexes"); *Kiefer v. Saul*,

No. CV 19-547, 2020 WL 1905031, at *3 (W.D. Pa. Apr. 17, 2020) (finding that the ALJ gave

"valid and acceptable reasons for discounting the weight accorded" to treating opinion because those opinions were, *inter alia*, "inconsistent with the conservative approach to her treatment") (citing 20 C.F.R. §§ 404.1527, 416.927); *cf. Tedesco v. Comm'r Soc. Sec.*, 833 F. App'x 957, 961 (3d Cir. 2020) (finding that the "ALJ adequately evaluated the opinions from [the claimant's] treating physicians and put forth sound reasons supported by substantial evidence" where the ALJ assigned only partial weight to a treating physician whose conservative course of treatment (ibuprofen) did not support absences from work twice a month); *Jimenez v. Colvin*, No. 15-3762, 2016 WL 2742864, at *4 (D.N.J. May 11, 2016) (noting that "the treatment was conservative: medication, including trigger point injections, and physical therapy").

Plaintiff nevertheless complains that ALJ Damille, in discounting Dr. Tikoo's opinion, selectively cited to "a total of five citations out of a record containing 2,548 pages." *Plaintiff's Memorandum of Law*, ECF No. 19, p. 20. The Court is not persuaded that this issue undermines ALJ Damille's consideration of Dr. Tikoo's opinion. While Plaintiff complains that ALJ Damille provided only five specific citations to the record, ALJ Damille cited to Dr. Tikoo's own treatment notes, *i.e.*, notes that undermined his opinion, R. 928; Plaintiff does not direct the Court to any other portion of Dr. Tikoo's treatment notes that ALJ Damille should have expressly considered or that otherwise undermined Dr. Tikoo's opinion. *See Plaintiff's Memorandum of Law*, ECF No. 19, pp. 20‒21. Moreover, the ALJ went on to point out that the record showed that Plaintiff's neck, back, and knee symptoms were managed routinely and conservatively, a fact that conflicts with Dr. Tikoo's extreme limitations. R. 928‒29.

Plaintiff goes on to point to other parts of the record that he believes undermines ALJ Damille's consideration of Dr. Tikoo's opinion. *Plaintiff's Memorandum of Law*, ECF No. 19, pp. 20‒21 (citations omitted). As a preliminary matter, Plaintiff's citation to this evidence

appears to be inconsistent with his attack on the opinions of the state agency reviewing physicians as "stale;" Plaintiff's cited evidence was generated many years before Dr. Tikoo's 2019 opinion. *See id.* (citing R. 695 (March 2013), 697 (May 2013), 699 (May 2013), 700 (August 2013), 703 (March 2014), 705 (April 2014), 706-07 (June 2014), 708-09 (September 2014), 717 (August 2012), 724 (May 2013)).[9] In any event, as previously discussed, the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson*, 497 F. App'x at 201; *see also Hatton*, 131 F. App'x at 880.

In short, for all these reasons, the Court concludes that ALJ Damille's findings regarding Plaintiff's physical RFC are consistent with the record evidence and enjoy substantial support in the record, as does his consideration of the opinions of Drs. Cortijo and Tikoo.

## VI.    CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).


Date:  June 28, 2022                                    _____*s/Norah McCann King*_____
                                                        NORAH McCANN KING
                                                        UNITED STATES MAGISTRATE JUDGE

---

[9] In noting these dates, the Court simply highlights the apparent inconsistency in Plaintiff's positions and does not suggest that evidence pre-dating a medical opinion is irrelevant or "stale."